IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | | |
|---|---|---|
| JACINTO RAGLAND, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 3:14-CV-190 |
| | § | |
| WARDEN JONES, *et al.*, | § | |
| Defendants. | § | |

## **MEMORANDUM OPINION AND ORDER**

Plaintiff Jacinto Ragland is an inmate in the custody of the Texas Department of Criminal Justice ("TDCJ") who has filed a civil rights lawsuit. The Court requested a *Martinez* report[1] from the Texas Attorney General's office, which the Attorney General's office provided (Dkt. 19 and Dkt. 20). The Court construed the *Martinez* report as a motion for summary judgment filed on behalf of the defendants and notified Ragland of that construction (Dkt. 21). Ragland has not responded, but the Court will consider Ragland's live complaint to be part of the summary judgment record because Ragland declared under penalty of perjury that the facts set forth in the complaint are true and correct (Dkt. 1 at p. 7). *See Hart v. Hairston*, 343 F.3d 762, 765 (5th Cir. 2003) ("On summary judgment, factual allegations set forth in a verified complaint may be treated the same as when they are contained in an affidavit."); *see also Davis v. Hernandez*, 798 F.3d 290, 293 (5th Cir. 2015)

---

[1] *Martinez v. Aaron*, 570 F.2d 317 (10th Cir. 1987); *see also Cay v. Estelle*, 789 F.2d 318, 323 & n.4 (5th Cir. 1986) (discussing the utility of a *Martinez* report).

("[F]ederal courts, this one included, have a traditional disposition of leniency toward *pro se* litigants.") (quotation marks omitted). After reviewing all of the evidence submitted, the parties' briefing, and the applicable law, the Court concludes that the defendants' motion for summary judgment must be granted for the reasons that follow.

I.  **BACKGROUND**

Ragland alleges that deliberate indifference to his safety and to his medical needs led to his falling down a flight of stairs and receiving inadequate medical treatment. On Friday, March 7, 2014, Ragland arrived at TDCJ's Darrington Unit (Dkt. 1 at p. 5). Ragland, who at the time was usually housed at the Connally Unit, was transferred to Darrington for the weekend because he was scheduled to have arthroscopic surgery on his right knee at the University of Texas Medical Branch in Galveston ("UTMB") the following week (Dkt. 1 at p. 5; Dkt. 20-12 at pp. 10–12). A correctional officer at Darrington assigned Ragland to a bunk on the second floor (Dkt. 1 at p. 5). At the time, Ragland had a temporary crutch pass and was restricted to lower bunks, but his classification documentation did not indicate either that he was restricted to first-floor housing or that he needed a wheelchair or special transport (Dkt. 19-1 at p. 3; Dkt. 20-14 at p. 41). Ragland does not claim that he was restricted to first-floor housing, and he does not claim that he was otherwise deemed a heightened fall risk. Nevertheless, Ragland protested his upper-floor housing assignment to the Darrington officer on the basis that he was on crutches and "c[ouldn't] go up . . . stairs" (Dkt. 1 at p. 5). According to Ragland, the confrontation drew the attention of a sergeant, who "threatened

to gas [Ragland]" if he continued to refuse the housing assignment (Dkt. 1 at p. 5). Ragland backed down and accepted the second-floor bunk (Dkt. 1 at p. 5). Unfortunately, on the following Monday, the day he was to be transported to UTMB, Ragland fell down the stairs at Darrington (Dkt. 1 at p. 5).

On the morning of the fall, Ragland was examined at Darrington (Dkt. 1 at pp. 5–6; Dkt. 20-14 at p. 64). Ragland's medical records reflect that Darrington medical staff were notified of Ragland's fall at 3:30 A.M. and arrived at the bottom of the steps at 3:35 A.M. (Dkt. 20-14 at pp. 61, 63). Ragland complained of pain in his neck, left hip, and right knee (Dkt. 20-14 at p. 63). The medical staff placed a neck brace on Ragland, rolled him onto a back board, lifted him onto a stretcher, and took him to the unit's infirmary for evaluation (Dkt. 20-14 at p. 63). Eric Ofeno, a Licensed Vocational Nurse, performed an initial evaluation at the infirmary and determined that Ragland was stable and alert, with a Glasgow coma score of 15 (Dkt. 20-14 at pp. 61–62).[2] Nurse Practitioner Terry Speer ordered x-rays of Ragland's hip, knee, and cervical spine and provided Tylenol 325 for the pain, which Ragland refused (Dkt. 20-14 at p. 63). Ragland was discharged from the Darrington infirmary in stable condition and sent to UTMB (Dkt. 20-14 at p. 64). Ofeno's notes indicate that Ragland "[a]mbulated out of [the Darrington] medical department without difficulty" (Dkt. 20-14 at p. 64).

---

[2]Emergency medical personnel use the Glasgow Coma Scale to assess the initial severity of brain injuries. A higher score means a less severe injury, and 15 is the highest score possible. *See* http://www.mayoclinic.org/diseases-conditions/traumatic-brain-injury/basics/tests-diagnosis/con-20029302.

When Ragland arrived at UTMB later that day, x-rays were taken of his left hip, right wrist, cervical spine, and lumbar spine (Dkt. 20-12 at p. 129). Although the left hip x-ray showed some soft tissue swelling, none of the x-rays showed evidence of a fracture or dislocation, so Ragland was released from UTMB's triage department and sent to UTMB's orthopedics department (Dkt. 20-12 at pp. 121, 129). Ragland's previously scheduled knee surgery was then performed without complications, and Ragland was discharged in stable condition (Dkt. 20-12 at pp. 12, 22). He then returned to the Connally Unit.

Ragland has named four defendants, all from the Darrington Unit: (1) "Mr. Jones," the warden; (2) "Mr. Linsey," a first-shift lieutenant; (3) "Ms. Perez," a nurse; and (4) "Mr. Reese," a doctor (Dkt. 1 at p. 3). Ragland has also listed as John Does the two correctional officers who first processed him at Darrington and the first-shift captain who was working at Darrington on the morning on which Ragland fell (Dkt. 1 at p. 4).

## II. THE PLRA AND SUMMARY JUDGMENTS

### A. The PLRA

The complaint in this case is governed by the Prison Litigation Reform Act (the "PLRA"). Upon initial screening of a prisoner civil rights complaint, the PLRA requires a district court to scrutinize the claims and dismiss the complaint, in whole or in part, if it determines that the complaint "is frivolous, malicious, or fails to state a claim upon which relief may be granted;" or "seeks monetary relief from a defendant who is immune from such relief." 28 U.S.C. § 1915A(b). A reviewing court may dismiss a complaint for these same

reasons "at any time" where a party, like Ragland, proceeds *in forma pauperis*. 28 U.S.C. § 1915(e)(2)(B) (mandating dismissal where the complaint is "frivolous or malicious," "fails to state a claim upon which relief may be granted," or "seeks monetary relief from a defendant who is immune from such relief"). The PLRA also provides that the court "shall on its own motion or on the motion of a party dismiss an action" if it is satisfied that the complaint is "frivolous, malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief from a defendant who is immune from such relief." 42 U.S.C. § 1997e(c).

Ragland proceeds *pro se* in this case. Courts construe pleadings filed by *pro se* litigants under a less stringent standard of review. *Haines v. Kerner*, 404 U.S. 519 (1972) (per curiam). Under this standard, "[a] document filed *pro se* is 'to be liberally construed,' *Estelle* [*v. Gamble*, 429 U.S. 97, 106 (1976)], and 'a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers.'" *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). Nevertheless, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (observing that courts "are not bound to accept as true a legal conclusion couched as a factual allegation"). The Supreme Court has clarified that "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). "A claim has facial

plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

### B. Rule 56

The Texas Attorney General's office has filed a *Martinez* report, which the Court construes as a motion for summary judgment filed on behalf of the defendants. Federal Rule of Civil Procedure 56 mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a sufficient showing of the existence of an element essential to the party's case and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In deciding a motion for summary judgment, the Court must determine whether the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. *Id.* at 322–23.

For summary judgment, the initial burden falls on the movant to identify areas essential to the non-movant's claim in which there is an absence of a genuine issue of material fact. *Lincoln Gen. Ins. Co. v. Reyna*, 401 F.3d 347, 349 (5th Cir. 2005). The movant, however, need not negate the elements of the non-movant's case. *See Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005). The movant may meet its burden by pointing out the absence of evidence supporting the non-movant's case. *Duffy v. Leading Edge*

*Products, Inc.*, 44 F.3d 308, 312 (5th Cir. 1995).

If the movant meets its initial burden, the non-movant must go beyond the pleadings and designate specific facts showing that there is a genuine issue of material fact for trial. *Littlefield v. Forney Indep. Sch. Dist.*, 268 F.3d 275, 282 (5th Cir. 2001). "An issue is material if its resolution could affect the outcome of the action. A dispute as to a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *DIRECT TV Inc. v. Robson*, 420 F.3d 532, 536 (5th Cir. 2006) (citations omitted).

In deciding whether a genuine and material fact issue has been created, the facts and inferences to be drawn from those facts must be reviewed in the light most favorable to the non-movant. *Reaves Brokerage Co. v. Sunbelt Fruit & Vegetable Co.*, 336 F.3d 410, 412 (5th Cir. 2003). However, factual controversies are resolved in favor of the non-movant "only when both parties have submitted evidence of contradictory facts." *Alexander v. Eeds*, 392 F.3d 138, 142 (5th Cir. 2004) (citation and quotation marks omitted). The non-movant's burden is not met by mere reliance on the allegations or denials in the non-movant's pleadings. *See Diamond Offshore Co. v. A & B Builders, Inc.*, 302 F.3d 531, 545 n.13 (5th Cir. 2002). Likewise, "conclusory allegations" or "unsubstantiated assertions" do not meet the non-movant's burden. *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 399 (5th Cir. 2008). Instead, the non-movant must present specific facts which show the existence of a genuine issue concerning every essential component of its case. *Am.*

*Eagle Airlines, Inc. v. Air Line Pilots Ass'n, Int'l*, 343 F.3d 401, 405 (5th Cir. 2003). In the absence of any proof, the Court will not assume that the non-movant could or would prove the necessary facts. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc).

Affidavits cannot preclude summary judgment unless they contain competent and otherwise admissible evidence. *See Love v. Nat'l Medical Enterprises*, 230 F.3d 765, 776 (5th Cir. 2000); *Hunter-Reed v. City of Houston*, 244 F.Supp.2d 733, 745 (S.D. Tex. 2003). A party's self-serving and unsupported statement in an affidavit will not defeat summary judgment where the evidence in the record is to the contrary. *Smith v. Southwestern Bell Tel. Co.*, 456 Fed. App'x 489, 492 (5th Cir. 2012) ("[W]e have repeatedly held that self-serving statements, without more, will not defeat a motion for summary judgment, particularly one supported by plentiful contrary evidence."); *United States v. Lawrence*, 276 F.3d 193, 197 (5th Cir. 2001); *In re Hinsley*, 201 F.3d 638, 643 (5th Cir. 2000); *see also Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

Lastly, Rule 56 does not impose upon the Court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment; evidence not referred to in the response to the motion for summary judgment is not properly before the Court, even if it exists in the summary judgment record. *Malacara v. Garber*, 353 F.3d 393,

405 (5th Cir. 2003). Although Ragland is proceeding pro se, "the notice afforded by the Rules of Civil Procedure and the local rules" is considered "sufficient" to advise a pro se party of his burden in opposing a summary judgment motion. *Martin v. Harrison County Jail*, 975 F.2d 192, 193 (5th Cir. 1992). Even a *pro se* plaintiff must specifically refer to evidence in the summary judgment record in order to put that evidence properly before the court. *Outley v. Luke & Associates, Inc.*, 840 F.3d 212, 217 (5th Cir. 2016).

### III. RAGLAND HAS NOT PRESENTED EVIDENCE OF DELIBERATE INDIFFERENCE TO HIS SAFETY.

Ragland alleges that Jones, Linsey, and the John Doe Darrington Unit correctional officers violated his rights under the Eighth Amendment by failing to accommodate him while his mobility was limited (Dkt. 1 at pp. 3–6). The primary allegations seem to be: (1) that two of the John Doe officers forced Ragland to take a second-floor housing assignment when he obviously could not climb stairs (Dkt. 1 at p. 5); (2) that the John Doe captain exacerbated injuries that Ragland sustained in his fall down the stairs by forcing Ragland to accept transport to UTMB when Ragland needed to stay and receive additional treatment at Darrington (Dkt. 1 at p. 6); (3) that Linsey "[i]nstructed officers to remove handcuffs after injury then told them to put them back on" (Dkt. 1 at p. 3); and (4) that Jones "[d]id not educate or properly train" his subordinates regarding "how to accommodate a partially paraplegic offender" (Dkt. 1 at p. 3).

#### A. Prisoners and safety—the legal standard

Under the Eighth Amendment, prisoners have a right to "humane conditions of

confinement[,]" and prison officials are required to provide the prisoners with adequate food, shelter, clothing, and medical care. *Herman v. Holiday*, 238 F.3d 660, 664 (5th Cir. 2001) (quotation marks omitted). Prison officials must take reasonable measures to guarantee the safety of the inmates. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). However, the Eighth Amendment mandates *reasonable* safety, not *absolute* safety; and prison officials are not liable when they make good-faith errors in assessing a potential danger. *Newton v. Black*, 133 F.3d 301, 308 (5th Cir. 1998). Not every injury suffered by a prisoner translates into Constitutional liability for prison officials responsible for the inmate's safety. *Farmer*, 511 U.S. at 834. Rather, Ragland must show that the defendants were deliberately indifferent to his safety. *Estelle v. Gamble*, 429 U.S. 97, 105–06 (1976).

The standard for deliberate indifference is extremely high and requires more than a showing that the defendants were negligent or mistaken in their judgment. *Id.*; *Domino v. Texas Dep't of Criminal Justice*, 239 F.3d 752, 756 (5th Cir. 1999). Establishing deliberate indifference, in fact, requires more even than a showing of gross negligence. *Whitley v. Hanna*, 726 F.3d 631, 641 (5th Cir. 2013) (pointing out that gross negligence is "a heightened degree of negligence" while deliberate indifference is "a lesser form of intent") (quotation marks omitted). To establish deliberate indifference in a prison conditions case, a prisoner must show that the prison officials: (1) were aware of facts from which an inference of an excessive risk to the prisoner's health or safety could be drawn; and (2) actually drew an inference that such potential for harm existed. *Palmer v. Johnson*, 193 F.3d

346, 352 (5th Cir. 1999). The deliberate-indifference standard is designed to be stringent enough to separate acts or omissions that amount to intentional choices from those that are merely unintentionally negligent oversights. *Southard v. Tex. Bd. Of Criminal Justice*, 114 F.3d 539, 551 (5th Cir. 1997). To that end, it draws on the test for "subjective recklessness" used in criminal law, which "generally permits a finding of recklessness only when a person disregards a risk of harm of which he is aware" and does not permit such a finding based on mere "failure to alleviate a significant risk that [the person] should have perceived but did not[.]" *Farmer*, 511 U.S. at 836–40.

In short, it would not be enough for Ragland to establish that he was injured by the negligence, or even the gross negligence, of the defendants. In order to establish an Eighth Amendment violation, Ragland must show that the defendants knowingly exposed him to and consciously disregarded a substantial risk of serious harm. *Brewer v. Dretke*, 587 F.3d 764, 770 (5th Cir. 2009).

### B.   Ragland's claims against the John Doe housing assignment officers

The Court will grant summary judgment on the claims against the John Doe housing assignment officers. Ragland's evidence, taken as true, establishes that the housing assignment officers ordered him to take a second-floor bunk over his protests that he could not climb stairs because he was on crutches (Dkt. 1 at p. 5). Under these circumstances, the facts that Ragland was on crutches and that he thought he needed a first-floor bunk do not constitute evidence that the housing assignment officers knowingly exposed Ragland to a

substantial risk of serious harm and consciously disregarded that risk. As previously noted, although Ragland had a temporary crutch pass and was restricted to lower bunks, his classification documentation did not indicate either that he was restricted to first-floor housing or that he needed a wheelchair or special transport (Dkt. 19-1 at p. 3; Dkt. 20-14 at p. 41). Ragland does not claim that he was restricted to first-floor housing, and he does not claim that he was otherwise deemed a heightened fall risk. Ragland was on his way to have surgery on his right knee at UTMB; but there is no evidence that his overall mobility was compromised so obviously, and to such an extent, that his placement in a second-floor bunk for one weekend necessarily constituted deliberate indifference to his safety.[3] Notably, Ragland was issued a ground-floor housing pass for the first time *after* his surgery—a clear sign that a ground-floor restriction (and a temporary one, at that) for Ragland was not deemed necessary until he entered postoperative care (Dkt. 20-13 at p. 26). Even immediately after the surgery, when Ragland had a ground-floor pass, his right leg was classified by the UTMB orthopedics department in a discharge note as "weight bearing as tolerated[;]" and Ragland was actually "encouraged [by Connally Unit medical personnel] to move as tolerated to increase healing and decrease risk for [deep vein thrombosis/pulmonary embolism]" (Dkt. 20-12 at p. 12; Dkt. 20-14 at pp. 35, 90). There is no evidence that Ragland's knee injury was ever classified as a non-weight-bearing one, and there is certainly no evidence that the

---

[3]Rather, as previously noted, the nursing notes in Ragland's medical records state that, even after his fall, Ragland "[a]mbulated out of [the Darrington] medical department without difficulty" (Dkt. 20-14 at p. 64).

Darrington housing officers knew it was so classified.

On this record, the housing officers could perhaps be found negligent in their assessment of a potential danger (an issue on which the Court expresses no opinion), but there is no evidence that they were deliberately indifferent to Ragland's safety. The two Darrington officers were evidently unfamiliar with Ragland, a Connally inmate; and Ragland's paperwork stated that, though he needed a lower bunk, he could be housed on an upper floor. Tellingly, a first-floor pass for Ragland was not deemed necessary until after his surgery, and even immediately post-surgery his right leg could bear weight as tolerated; he was in fact encouraged by Connally Unit medical personnel to walk on the right leg to promote healing and prevent blood clots. There is, in short, no evidence showing that, when they ordered Ragland to take a bunk on the second floor at Darrington over the weekend, the housing officers were aware of facts from which an inference of an excessive risk to Ragland's health or safety could be drawn and actually drew an inference that such potential for harm existed.

### C. Ragland's claims against the John Doe captain

The Court will grant summary judgment on the claims against the John Doe captain. Ragland's evidence, taken as true, establishes that the captain ordered Ragland to get on the bus from Darrington to UTMB even though Ragland told the captain that he was "hurting" because he had sustained an "injury to [his] left hip" in his fall down the stairs (Dkt. 1 at p. 6). There is no evidence of deliberate indifference to Ragland's safety on the part of the

captain. Ragland was seen in the Darrington Unit infirmary immediately after his fall; and the unit medical personnel, after evaluating Ragland, discharged him to his "[UTMB] medical chain as planned[,]" meaning that he could be taken to UTMB for his scheduled knee surgery (Dkt. 20-14 at p. 64). At the unit infirmary, Ragland refused pain medication (Dkt. 20-14 at p. 64). X-rays performed on Ragland's left hip at UTMB uncovered no sign of a dislocation or fracture (Dkt. 20-12 at p. 129). There is no evidence that the captain was aware of facts indicating that it was unsafe to transport Ragland—especially since Ragland was leaving the Darrington Unit to go to a hospital.

### D. Ragland's claims against Linsey

The Court will grant summary judgment on the claims against Linsey. Ragland's evidence, taken as true, establishes that Linsey instructed subordinate officers to remove Ragland's handcuffs after his fall and then instructed them to put the handcuffs back on (Dkt. 1 at p. 3). It is unclear how this shows deliberate indifference to Ragland's safety, and Ragland does not make any other allegations regarding Linsey. If Ragland is trying to say that handcuffs contributed to his fall down the stairs, he does not provide any evidence that Linsey knowingly exposed him to and consciously disregarded a substantial risk of serious harm from the handcuffs. More fundamentally, Ragland does not allege that Linsey had anything to do with either the upper-floor housing assignment (which is what forced Ragland to use the stairs) or the fact that Ragland was wearing handcuffs when he fell.

### E. Ragland's claims against Jones

The Court will grant summary judgment on the claims against Jones. Ragland's evidence against Jones consists entirely of one conclusory, unsubstantiated statement: that Jones "[d]id not educate or properly train" his subordinates regarding "how to accommodate a partially paraplegic offender" (Dkt. 1 at p. 3). Ragland, of course, was not "partially paraplegic"—he had a lateral meniscus tear in his right knee (Dkt. 20-12 at p. 21). The term "paraplegia" typically refers to "paralysis [that] affects all or part of the trunk, legs and pelvic organs[;]" and it is most commonly associated with spinal cord injuries. *See* http://www.mayoclinic.org/diseases-conditions/spinal-cord-injury/basics/symptoms/con-2 0023837. Ragland was never diagnosed with paraplegia.

In any event, a failure-to-train claim under Section 1983 requires the plaintiff to show: (1) that the supervisor failed to train the subordinate official; (2) that a causal link exists between the failure to train and the violation of the plaintiff's Constitutional rights; and (3) that the failure to train amounts to deliberate indifference. *Porter v. Epps*, 659 F.3d 440, 446 (5th Cir. 2011). Ragland presents no evidence to establish any of these elements. There are no facts showing whom Jones failed to train, what link exists between that failure to train and any violation of Ragland's rights, or how that failure to train amounts to deliberate indifference. Furthermore, as discussed elsewhere in this opinion, the Court sees no underlying Constitutional violation committed by any subordinate of Jones's, so Jones cannot possibly be held liable on a failure-to-train theory. *See Rios v. City of Del Rio, Tex.*, 444 F.3d

417, 425–26 (5th Cir. 2006) ("It is facially evident that this test cannot be met if there is no underlying constitutional violation.").

## IV. RAGLAND HAS NOT PRESENTED EVIDENCE OF DELIBERATE INDIFFERENCE TO HIS SERIOUS MEDICAL NEEDS.

Ragland seeks relief under the Eighth Amendment against Perez and Dr. Reese for what he alleges was the unconstitutional denial of medical care at the Darrington Unit. The Court notes that there is no mention of a "Nurse Perez" or a "Dr. Reese" anywhere in Ragland's medical records; at the Darrington Unit infirmary, Ragland was seen by Eric Ofeno, a Licensed Vocational Nurse, and Terry Speer, a Nurse Practitioner. Whomever Ragland is trying to sue, these claims are also governed by the deliberate-indifference standard.

### A. Prisoners and medical care—the legal standard

A prisoner may succeed on a claim under 42 U.S.C. § 1983 for inadequate medical care only if he demonstrates "deliberate indifference to serious medical needs" on the part of prison officials or other state actors. *Estelle*, 429 U.S. at 104. The conduct alleged must "constitute an unnecessary and wanton infliction of pain" or "be repugnant to the conscience of mankind." *Id.* at 104–06 (quotation marks omitted). The prisoner must first prove objective exposure to a substantial risk of serious harm. *Gobert v. Caldwell*, 463 F.3d 339, 345–46 (5th Cir. 2006). To then prove subjective deliberate indifference to that risk, the prisoner must show both: (1) that the defendant was aware of facts from which the inference of an excessive risk to the prisoner's health or safety could be drawn; and (2) that the

defendant actually drew the inference that such potential for harm existed. *Farmer*, 511 U.S. at 837; *Harris v. Hegmann*, 198 F.3d 153, 159 (5th Cir. 1999). This is an "extremely high standard to meet"—*Domino*, 239 F.3d at 756—and, absent exceptional circumstances, it is not met by an incorrect diagnosis, unsuccessful medical treatment, acts of negligence, medical malpractice, or a prisoner's disagreement with his medical treatment. *Id.*; *Gobert*, 463 F.3d at 346. Rather, the prisoner must show that the defendant "refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Brewster*, 587 F.3d at 770 (quotation marks omitted).

"Deliberate indifference is not established when medical records indicate that the plaintiff was afforded extensive medical care by prison officials." *Brauner v. Coody*, 793 F.3d 493, 500 (5th Cir. 2015) (quotation marks and brackets omitted). The Constitution does not require that prisoners receive optimal care, and the fact that a prisoner's medical treatment "may not have been the best that money could buy" is insufficient to establish a Constitutional claim. *Mayweather v. Foti*, 958 F.2d 91 (5th Cir. 1992); *see also Gobert*, 463 F.3d at 349 ("[D]eliberate indifference exists wholly independent of an optimal standard of care."); *McMahon v. Beard*, 583 F.2d 172, 174 (5th Cir. 1978) ("[The] plaintiff stated that he had not received 'optimum' or 'best' medical treatment. Were this the legal standard, a trial of the issues might be required.").

### B. Ragland's claims against Perez and Dr. Reese

As is the case with his indifference-to-safety claims, Ragland provides no evidence to support his allegations of deliberate indifference to his serious medical needs; and the care outlined in his medical records rebuts those allegations. *See Brauner*, 793 F.3d at 498–500. Specifically, Ragland claims that Perez examined him in the Darrington Unit infirmary and "stated she saw no visible injuries" (Dkt. 1 at p. 5). Perez then "called a Doctor Reese who was at home"—presumably, Dr. Reese was on call (Dkt. 1 at p. 6). Dr. Reese told Perez to clear Ragland to be transported to UTMB (Dkt. 1 at p. 6).

Again, absolutely none of this is in Ragland's medical records. But even assuming that it is all true, there is no evidence of deliberate indifference to Ragland's serious medical needs. Ragland argues that Perez should have undressed him and that, had she done so, she would have seen the injury to his left hip, which Ragland contends was serious enough to necessitate further treatment at Darrington and postponing the trip to UTMB. It is true that, "[u]nder exceptional circumstances, a prison official's knowledge of a substantial risk of harm may be inferred by the obviousness of the substantial risk." *Hegmann*, 198 F.3d at 159 (quotation marks omitted). But this case does not present such circumstances. In the face of contemporaneous medical examinations (at both Darrington and UTMB) and x-rays that uncovered no serious injury, Ragland's bald, unsubstantiated statements are not enough to establish that his fall caused a left hip injury that was so conspicuous, and so conspicuously grave, that clearing him for transport to UTMB constituted evidence of deliberate indifference to his medical needs.

The Court will grant summary judgment on the claims against Nurse Perez and Dr. Reese.

## V. **CONCLUSION**

Based on the foregoing, the Court **ORDERS** as follows:

1. The defendants' motion for summary judgment (Dkt. 19 and Dkt. 20) is **GRANTED**, and all claims against them are dismissed with prejudice.

2. Any other pending motions are **DENIED** as moot.

The Clerk is directed to provide a copy of this order to the parties and to *amicus* counsel.

SIGNED at Galveston, Texas on September 29, 2017.

GEORGE C. HANKS, JR.
UNITED STATES DISTRICT JUDGE